N. W. CONTROLS, INC., a Pennsylvania corporation, Plaintiff,

v.

OUTBOARD MARINE CORPORATION, a Delaware corporation, Defendant.

Civ. A. No. 3730.

United States District Court, D. Delaware.

Oct. 28, 1971.

---

See also, D.C., 317 F.Supp. 698.

Brereton Sturtevant, of Connolly, Bove & Lodge, Wilmington, Del., and John T. Synnestvedt, Thomas L. Cantrell and J. Donald McCarthy, of Synnestvedt & Lechner, Philadelphia, Pa., of counsel, for plaintiff.

James M. Tunnell, Jr., William O. La-Motte, III and Lawrence A. Kelly, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., and Max H. Fruhauf, of Butzel, Levin, Winston & Quint, Detroit, Mich., of counsel, for defendant.

## OPINION

LATCHUM, District Judge.

This is a civil antitrust action brought by N. W. Controls, Inc. ("N.W.") against the Outboard Marine Corporation ("O. M.C.").

The plaintiff, N. W., is a Pennsylvania corporation with its principal place of business at Vernfield, Pennsylvania. It manufactures and sells remote control cables and control boxes for use on outboard and stern drive boat engines, snowmobiles, and other products. The defendant, O. M. C., is a diversified manufacturing company which produces out-

board and stern drive boat motors and accessories, lawn mowers, golf carts, chain saws, snowmobiles and other products. Its principal marine products are Evinrude and Johnson outboard motors, O.M.C. stern drive units, and Gale marine accessories. O.M.C. is a Delaware corporation with its principal marine manufacturing facilities at Waukegan, Illinois, Milwaukee, Wisconsin, and Galesburg, Illinois.

■ N.W. alleges that O.M.C. has violated Section 1 of the Sherman Anti-Trust Act ("Sherman Act"), 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14, by tying the sale of its brand of outboard and stern drive remote control cables and control boxes to the sale of its electric gear shift equipped outboard and stern drive engines. N.W. further charges that O.M.C. illegally tied the sale of its control boxes to the sale of its mechanical shift outboard engines by applying coercive pressure upon its engine dealers in violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act. N.W. also alleges that O.M.C. has violated Section 2 of the Sherman Act, 15 U.S.C. § 2, by refusing to deal with N.W., as a supplier, in its purchases of remote control cables, by engaging in predatory price manipulation in the remote control cable market,[1] and by setting up a competitor to N.W. in an effort to injure N.W. during the pendency of the present lawsuit. N.W. seeks treble damages, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, and permanent injunctive relief, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. Jurisdiction exists in this Court by virtue of 28 U.S.C. § 1337 and venue is properly laid in this district under 28 U.S.C. § 1391, 15 U.S.C. § 15 and 15 U.S.C. § 22.

In order to fully understand the main contentions made, a brief background is necessary. Outboard motors were originally one or two cylinder engines of small horsepower which were mounted on the transom of small fishing boats. The development of the modern outboard motor dates from the 1922 entry of the Johnson Motor Company (formerly Johnson Motor Wheel Company, a manufacturer of bicycle engines)[2] into the outboard motor field. (Tr. 1111).[3] Outboard motors became lighter, higher powered, better balanced and more portable. (Tr. 1115.) Around 1930 electric starters were introduced. (Tr. 1116.) In 1948 mechanical gear shifts were placed on outboards. (Tr. 1117.) In 1958 multiple cylinder engines came on the market. (Tr. 1117.) Since that time horsepower has been increased until today outboards in excess of 100 horsepower are available.

In the early models, and today with smaller horsepower engines, all control functions (steering, throttling, and, after its introduction, gear shifting) were all performed by the operator seated at the rear of the boat next to the motor. However, as boats and motors became larger, it became more difficult and dangerous to operate the boat seated next to the motor. Remote control stations began to be used. These remote control stations contained a steering wheel and remote

---

1. N.W. also contends that Section 3 of the Robinson-Patman Act, 15 U.S.C. § 13a, was violated by O.M.C.'s alleged price manipulation. However, it has been explicitly held that no private civil cause of action can be maintained for a violation of Section 3 of the Robinson-Patman Act. Nashville Milk Co. v. Carnation Co., 355 U.S. 373, 377, 78 S.Ct. 352, 2 L.Ed.2d 340 (1958); Gold Fuel Service, Inc. v. Esso Standard Oil Co., 306 F.2d 61, 62 (C.A.3, 1962), cert. den. 371 U.S. 951, 83 S.Ct. 506, 9 L.Ed.2d 500 (1963).

2. Outboard Marine Corporation is the product of a series of mergers. In 1929 Lockwood Ash Motor Company, Elto Outboard Motor Company, and Evinrude Motor Company joined together to form Outboard Motors Corporation. In 1936 this company combined with Johnson Motor Company to form Outboard Marine and Manufacturing Corporation. (Tr. 1112.) The corporation assumed its present name in 1956.

3. "Tr." refers to the Trial Transcript. "PX", "PDX", "DX", and "DDX" will refer to Trial Exhibits.

control box with levers which controlled throttling and gear shifting functions. The controls at the remote station were connected to the motor by means of flexible remote control cables.

For throttling and mechanical gear shifting, the two engine control functions, the control cables consist of elongated flexible conduits containing freely moving core wires. Specially configured end fittings attach to mated fittings at the motor and control box end. At first, two control cables, one for the mechanical shift and one for the throttle, were run from the motor to a control box and there attached to two separate levers, appropriately designated for the shift and throttle. In the early 1960's, single lever control boxes, capable of mechanically controlling both the throttle and gear shift operation by means of one single lever, were developed. However, two separate control cables were still needed, one for the throttle and one for the mechanical shift.

In the 1962 model year, which began in the fall of 1961, O.M.C. introduced the first outboard engines with electrically operated gear shift. At about the same time, O.M.C. introduced its first stern drive units.[4] All O.M.C. stern drives have been equipped with electric shift. For these outboard and stern drive engines, gear shifting is done by means of an electric solenoid operated clutch.[5] Shifting is done by an electric switch on the control box, linked to the engine's shift mechanism through a harness of wires which plugs into the engine. The throttle, however, is still operated mechanically by means of a remote control cable attached to a single lever on the control box.

With the advent of electric shift engines, O.M.C. began the policy of including, as part of its outboard or stern drive engine "package," remote control cables and control boxes. For stern drive units the cables and boxes were packed with the motor in the shipment.[6] Remote control boxes were also packed with Johnson and Evinrude outboard engines. In addition, purchasers of electric shift outboard motors received, with their motor and control box, a "cable certificate" which entitled them to obtain from their dealer one O.M.C. control cable of whatever length was necessary to fit the boat.[7]

4. "Stern drive units," "stern drives," "inboard/outboard units" or "I/O units" are small boat power plants in which the engine itself is within the boat near the stern, while the drive mechanism and propeller housing (commonly referred to as the "vertical drive unit") are mounted outside the boat at the stern thereof. Stern drive units are built in models ranging from around 80 horsepower to 210 horsepower.

5. Stern drive and outboard engines differ in their shift mechanisms. The stern drive engines have two electro-magnetic clutches. An electric current thus engages the forward or reverse clutch. (Tr. 1898–1899). On outboard engines a clutch dog is engaged against the forward gears by a spring. An hydraulic cylinder controlled by two electric solenoids pushes the dog into neutral when one solenoid is activated and into reverse when the second solenoid is activated. (Tr. 1900–1902.) Thus, unlike the stern drive, a power failure will leave the outboard in forward gear.

6. Because stern drive units are sold to boat builders for installation in new boats, the exact cable length is known, enabling a cable of the proper length to be shipped with each unit.

7. In summary the cable certificate program operates as follows:
   When O.M.C. sells its electric shift outboard engines, it provides through its Evinrude and Johnson engine divisions a certificate entitling the customer, at no further cost, to a control cable for the engine's throttle. The customer or dealer decides on the length of cable the boat requires and the engine dealer provides the customer with such a throttle control cable in exchange for the certificate. The certificates are then redeemed by the dealer, either singly or in accumulation, with an O.M.C. Gale division parts distributor for credit on cable purchases. The parts distributor in turn accumulates certificates and redeems them with the Gale division for credit on cable purchases. The Gale division re-

This new policy with regard to remote control cables and control boxes constitues the major focus of N.W.'s claims.

The motion of N.W. for a preliminary injunction was denied by this Court on October 6, 1970. 317 F.Supp. 698. After one postponement, trial was commenced on March 1, 1971. The non-jury trial consumed thirteen trial days between March 1 and March 17. Post-trial briefing having been concluded, the case is now ripe for determination. Each of the major issues will be dealt with separately.

## I. TIE-IN SALES OF REMOTE CONTROL CABLES WITH ELECTRIC SHIFT ENGINES.

N.W. has charged that O.M.C. violated Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14, by tying the sale of its O-style cables [8] to the sale of its electric shift outboard and stern drive engines.

■ A tie-in is generally defined as an arrangement under which the vendor will sell one product (the tying product) only on condition that the buyer also purchase another and different product (the tied product). A successful tie-in thus has two anticompetitive impacts. It forecloses the seller's competitors in one market (the tied market) through use of market leverage and power developed in another market (the tying market), and it compels a purchaser to buy a product he may not want in order to obtain one he desires. Northern Pacific Ry. v. United States, 356 U.S. 1, 5–6, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). Such tie-in sales can rarely be justified because it is said they "serve hardly any purpose beyond the suppression of competition." Standard Oil Co. v. United States, 337 U.S. 293, 305–306, 69 S.Ct. 1051, 1058, 93 L.Ed. 1371 (1949). Ac-

cordingly, tie-in sales are almost always regarded as illegal under both Section 3 of the Clayton Act and Section 1 of the Sherman Act. Northern Pacific Ry. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958) (§ 1); International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947) (§§ 1 and 3); International Business Machine Corp. v. United States, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085 (1936) (§ 3).

■■ The standard of illegality under the two Acts is not identical. If the tying or tied products are "goods, wares * * * or other commodities," the case falls within the ambit of the Clayton Act [9] and the plaintiff need only show that "a substantial volume of commerce in the 'tied' product is restrained." Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 608–609, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). If the tie does not involve a commodity but concerns land, services or credit, which do not fit the Clayton Act's language, it is governed by the Sherman Act and the plaintiff is required to bear the additional burden of proving that the defendant's economic power with respect to the tying product is sufficient to produce an appreciable restraint. However, the "sufficient economic power" test for per se illegality may be inferred if it appears that the seller has the power to impose other burdensome terms, such as a tie-in, with respect to any appreciable number of buyers within the market. Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969).

In the instant situation, there is no question that the tied products—remote control cables and electric shift outboard and stern drive engines—are commodities within the meaning of Section 3 of

turns the certificates to the Evinrude and Johnson engine division and charges the division involved a set price by means of an inter-divisional accounting transaction. (Stip. Facts 29, 30.)

8. O-style cables are those which have end fittings that can only be used with engines manufactured by O.M.C.

9. The Clayton Act applies only to sales or leases "of goods, wares, merchandise, machinery, supplies, or other commodities." 15 U.S.C. § 14.

the Clayton Act.[10] Furthermore, O.M.C. has conceded that the practice of tying the sale of its cables to the sale of either type of engine "affects a substantial volume of commerce" (Stip. Facts 6, 56). Thus, the requirements for finding a violation of Section 3 of the Clayton Act have been met unless either of the two defenses advanced by O.M.C. in justification of the tie-in has merit.

O.M.C. asserts two defenses to justify its tie-in sales. First, O.M.C. argues that the Clayton Act is inapplicable because the tie-in of remote control cables with its electric shift engines amounts to no more than a bundling of several parts of one product. Secondly, O.M.C. contends that, even if the Court should find that the tied products are separate items, there is a legitimate business purpose for the tie-in, viz., the protection of O.M.C.'s good will in the electric shift engine market.

## A. The Single Product Defense.

■ It is well settled that neither the Clayton nor Sherman Act is violated by tie-in sales of remote control cables with electric shift engines if these items are but parts of a single product. Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 507, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); Northern Pacific Railway Co. v. United States, 356 U.S. 1, 5, 6, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 614, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); International Manufacturing Co. v. Landon, Inc., 336 F.2d 723, 730 (C.A.9, 1964), cert. denied, 379 U.S. 988, 85 S.Ct. 701, 13 L.Ed.2d 610; United States v. Jerrold Electronics Corp., 187 F.Supp. 545, 559 (E.D.Pa.1960), aff'd per curiam, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961); Turner, The Validity of Tying Arrangements Under the Antitrust Law, 72 Harv.L.Rev. 50, 67, 68 (1958). However, this rule is easier to state than to apply because antitrust decisions and literature contain astonishingly little discussion of the criteria to be applied to distinguish between component parts of a single product and a multiplicity of products. As a general rule, however, a manufacturer cannot be forced to deal in the minimum product that could be sold or is usually sold. On the other hand, it is equally clear that one cannot circumvent the antitrust laws simply by proclaiming that he is selling a single product. Thus, where a combination of items are sold as a single product, the facts in each case must be carefully reviewed in order to determine whether the inference is overcome that such sales are actually disguised tie-ins.

■ For the reasons following, the Court concludes that a remote control cable and an outboard or stern drive electric shift engine should not be classified as component parts of a single product.

1. O.M.C.'s contemporaneously written records reveal that it considered remote control cables to be accessory items to be marketed separately from its engines. Indeed, before 1961, the year O.M.C. began to tie the sale of electric shift engines and control cables, all mechanical shift engines and cables were sold as separate items. (Sauerberg Dep. 75–76—Docket Item 133.) Beginning in early 1960, O.M.C. noticed the effects of competition in the engine accessory market and embarked upon a promotion program aimed at its distributors and dealers to reverse that trend. (PDX 31.) On June 8, 1960, O.M.C. further noted that the sales of accessories were down 14 per cent from the previous year. To regain this lost percentage of sales O.M.C. announced the intention "to immediately begin a program of more aggressively pushing the sales of existing accessories." (PDX 32.) At the August 9, 1960 meeting of the Operations Committee it was suggested that Teleflex, Inc., O.M.C.'s supplier of remote control cables, be dropped as a supplier since Teleflex was then selling cables in competi-

---

10. Since the tied products are commodities covered by Section 3 of the Clayton Act, there is no need to consider the applicability of the Sherman Act.

tion with O.M.C. (PDX 33.) Then on November 9, 1960, the Operations Committee, noting that the "sale of accessories—and particularly cables—is down" wrote that some consideration is being given to reducing O.M.C.'s list price on cables and further recorded:

" * * * [That] consideration also is being given to selling accessories with the motor *to insure our getting the sale.*" (Emphasis added.) (PDX 35.)

2. In addition to the above written records, O.M.C. issued two "Policy and Procedure" memoranda which expressly classified remote control cables as accessory items and not as component parts of O.M.C.'s engines.[11] (PDX 85, 94.)

While O.M.C. strenuously argues that the use of the term "accessories" in the written records referred to above were not meant to infer that remote control cables were not component parts of electric shift engines, it is apparent that O.M.C. officials considered such cables to be separate products from its engines, including electric shift engines. This conclusion finds support in a statement—arising out of an intra-company dispute between the Vice-President of O.M.C.'s Gale Products Division and O.M.C.'s Central Accounting Department—concerning whether the "parts depot" of Gale Products should get the profit from cables sold in the trade through the certificate program or whether the Johnson or Evinrude Engine Divisions should be credited with the cable profit. The Vice-President of the Gale Products Division wrote, on October 16, 1961, to Central Accounting:

"Keep in mind that the cable is not a part of the motor when the latter is sold. Nor is it necessary to the engines operation—a competitive cable would suffice." (PDX 66.)

3. O.M.C.'s marketing practice with respect to its mechanical shift engines likewise supports the conclusion that remote control cables and engines are separate products. O.M.C. has always sold and now sells its mechanical shift engines without tying in the sale of cables. (Tr. 1244.) Between 1962 to 1969 O.M.C. sold over 290,000 mechanical shift outboard engines, ranging from 33 to 115 horsepower, without a tie-in of cables. (Ans. to plaintiff's Int. 108—Docket Item 98.) A minimum of 80 per cent of all outboard mechanical shift engines sold, having a horsepower of 33 and 40 horsepower, use remote control cables for throttling purposes and substantially all mechanical shift outboard engines of 50 horsepower and above are used with remote control cables. (Stip. Fact 10.) The use of such cables on mechanical shift engines is more than a matter of style with the bigger and faster engines, for they are unsafe to operate while sitting in the stern. (Stip. Fact 8; Tr. 1119, 1130.) The heavier weight of the engine in the stern has to be offset by some distribution forward, for the combined weight of the engine and operator causes many boats to settle too low in the stern for good visibility and handling. (Tr. 1130; Stip. Fact 8.)

Thus, from the point of view of safety, ease of operation and convenience, the use of remote control throttle cables is a practical necessity whenever large outboard engines are used on a boat. Yet, O.M.C. has always and continues to market its mechanical shift outboard engines of 33 horsepower and above without tying in the sale of cables. Therefore, O.M.C.'s claim that a remote throttle cable is a component part of an electric shift outboard engine because it could not otherwise be throttled appears to be simply a make-weight argument. Particularly is this so when mechanical

11. The first memorandum, issued March 5, 1962, was prepared by Howard F. Larson, Vice-President of Marketing, and John Robertson, Vice-President of Planning. The second memorandum, issued November 13, 1964, was prepared by J.

L. Rayniak, O.M.C.'s Executive Vice-President. See also correspondence of Samuel Spink, O.M.C.'s Director of Marketing, referring to control cables as accessories. (PDX 149, 150.)

shift outboard engines of 33 horsepower and above are just as difficult and dangerous to operate without the same type of remote control throttle cable, yet such cables are classified differently and sold separately by O.M.C.

4. The throttle mechanism which O.M.C. uses on its electric shift outboard engines is substantially identical to the throttle mechanism on its mechanical shift outboard engines, and the O-style cables used to regulate the throttle of both engines are identical. (Tr. 1153–1157.) O.M.C. has made no distinction between the remote throttle cable used on the mechanical shift and electric shift outboard engines which would in any way justify the conclusion that such a control cable is a part of a single product when sold with an electric shift engine, but is a separate product when sold with a mechanical shift engine.

5. O.M.C. has sold large quantities of its O-style cables independently of its sales of mechanical shift outboard engines. O.M.C. also purchases its remote control cables, pursuant to its specifications, as a distinct product from a number of outside suppliers. These factors also militate against O.M.C.'s claim that cables are a part of a single product when sold with an electric shift outboard engine. See Susser v. Carvel Corp., 332 F.2d 505, 514 (C.A.2, 1964), cert. dis. 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965).

6. O.M.C.'s cable certificate program does not insure that an O.M.C. throttle cable will be used on an O.M.C. electric shift outboard engine. When dealers receive cable certificates for O.M.C.'s engines, their normal practice is not to immediately redeem that certificate for one of O.M.C.'s cables. Generally, such certificates are redeemed in groups of ten or fifteen. Thus, when an O.M.C. outboard engine is installed in a boat, the dealer uses a cable from his inventory on hand which might be an O.M.C. cable or a cable of another brand. (Tr. 419–420, 447–448.) Accordingly, there is no assurance under the certificate program that an O.M.C. cable, which O.M.C. claims to be a component part of a single product, is ever matched with an electric shift outboard engine. At the very least it would appear necessary, in order to call two items parts of a single product, that the two items without fail should be used together. The evidence shows that frequently this is not the case.

7. O.M.C.'s major competitor in the outboard engine market is the Kiekhaefer-Mercury Division of the Brunswick Corporation which markets mechanical shift outboard engines under the name of Mercury. Since the 1964 model year, Mercury outboard engines of 40 horsepower and above have included no means to throttle the engine without remote control cables. Such cables, however, must be purchased in a separate transaction from the purchase of an engine and for a price separate from the price of the engine. (PX 360–363; Tr. 2144–2147, 2149–2160.) While the attitude of a competitor who considers cables and engines to be separate items is not conclusive, it is relevant, and when coupled with O.M.C.'s own practice with respect to mechanical shift outboard engines, it tends to show an industry-wide belief that engines and cables are separate products.

8. Those factors discussed above, which prompted this Court to hold that a remote control throttle cable is a separate product from the electric shift outboard engine, are equally applicable to the O.M.C.'s practice of bundling cables with its stern drive engines. While the throttle assembly on an O.M.C. stern drive engine differs from that on an electric shift outboard engine, this difference does not make the cable needed to adjust the throttle a part of the engine and there appears to be no engineering reason for tying cables to stern drive engines. (Tr. 1801–1803.) Moreover, O.M.C. has on occasion sold its stern drive engines to boat builders without requiring them to purchase remote control cables. (Tr. 1331–1334, 1350–1355; PDX 148, 149, 150, 151, 248.) When the latter practice has been followed, O.M.C. gives a rebate on the purchase

price of the cable which is less than the price that a boat builder or distributor would have to pay for a similar cable. (Tr. 1355–1365, 1383–1391; PDX 148, 149, 150, 151, 172, 248.)

On the basis of the evidence summarized above, the Court finds that remote control throttle cables are not component parts of electric shift outboard or stern drive engines but are separate products. Thus, O.M.C.'s tie-in sales of cables with these types of engines can not be justified legally on the basis that these items constitute component parts of a single product.

### B. The Good Will Defense.

■■ Prior to Northern Pacific Ry. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958), it had been consistently recognized that the tying together of separate products, which would normally amount to a per se violation of the antitrust laws, might be justified in certain circumstances by the seller's interest in protecting its good will in the tying product. International Business Machs. Corp. v. United States, supra, 298 U.S. at 140, 56 S.Ct. 701 (1936); United States v. United Shoe Mach. Co., 264 F. 138, 167 (E.D.Mo. 1920), aff'd, 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708 (1922). When the *Northern Pacific* decision was handed down there was some thought that its declaration that tying arrangements were per se illegal (356 U.S. at 6, 78 S.Ct. 514) had abolished the good will defense. Subsequent cases, however, have clearly established that tie-in sales might possibly be justified on the grounds of a legitimate business interest, including the protection of a manufacturer's good will. Susser v. Carvel Corp., supra, 332 F.2d at 519, 520; Dehydrating Process Co. v. A. O. Smith Corp., 292 F.2d 653, 655 (C.A.1, 1961), cert. denied 368 U.S. 931, 82 S.Ct. 368, 7 L.Ed.2d 194 (1961); Teleflex Industrial Products, Inc. v. Brunswick Corp., 293 F.Supp. 106, 110 (E.D. Pa.1968), vacated and remanded, 410

F.2d 380 (C.A.3, 1969); United States v. Jerrold Electronics Corp., supra, 187 F.Supp. at 546. Nevertheless, the Court concludes that O.M.C.'s good will defense, based on the evidence adduced in this case, can not justify the tie of cables to electric shift outboard and stern drive engines.

O.M.C.'s cable expert William J. Shimanckas, who drew up O.M.C.'s cable specifications, conceded that cables not meeting O.M.C. requirements [12] would not injure its engines. (Tr. 1825.) More significantly O.M.C. does not attempt to explain why, if such specifications are so important for good will, the Company has sold nearly 300,000 mechanical shift outboard engines without a tie-in of the cables necessary to operate such engines. The cables O.M.C. markets separate from the mechanical shift engines must meet the same specifications that cables tied to the electric shift outboard engines must meet. (Shimanckas Dep. 111–120—Docket Item 121; Tr. 1568–1576; PDX 117.) While O.M.C. alludes to a number of operational and safety problems that could arise from using inferior cables with electric shift outboard engines, no evidence was presented to prove that electric shift engines were more susceptible to such problems than mechanical shift engines of the same horsepower. Nor did O.M.C. offer proof of one instance in which cables of other manufacturers, used with either an O.M.C. mechanical or electric shift engine, caused damage or malfunctioning. In fact, the evidence that was presented appears to the contrary. At least some dealers, who have used both N.W.'s and O.M.C.'s O-style cables, prefer N.W.'s cables in a boat powered by one of O.M.C.'s electric shift engines. (Tr. 420–421, 428–429, 448.)

In support of its good will defense, O.M.C. principally stresses two cases. The first is United States v. Jerrold Electronics Corp., supra, 187 F.Supp. 545. That case involved the tying of all parts necessary for the functioning of a

---

12. O.M.C.'s requirement for efficiency is 69.78% and for backlash is ⅟₁₆ of an inch. (PDX 117.)

community television antenna, including a service contract which provided all technical services for the system. The court was of the opinion that the government had established the prerequisites needed to declare the tie per se illegal, however, the court recognized that the peculiar facts of that case did not justify such a holding. Jerrold was the pioneer in the complex electronics market of cable television. It had to use sensitive and unstable equipment. Past experience with two trial locations showed that any new system would require adjustments and that in most of the communities Jerrold would service there were no people with the technical training to do any of the work. Therefore, the court in allowing the tie-in of the service contracts stated:

"A rash of systems with unsatisfactory pictures could not be tolerated. The amount of capital necessary to start a system was substantial. Interest would wane rapidly if the systems installed did not consistently produce satisfactory results. Not only Jerrold's reputation but the growth of the entire industry was at stake during the development period. In addition to its reputation, Jerrold was also dependent upon successful system operation for payment. Many operators were not in a position to pay cash for the necessary equipment and the risks were such that outside financing could not be obtained. Therefore, payment was often contingent on the success of the system. It appeared that it was cheaper and more practical to insure that a system was properly installed in the first place than to attempt to get it operating once it was strung up. Furthermore, * * *, use of existing utility poles was an important cost and public relations factor. The utility companies were reluctant to have men of unknown ability working on their poles. Therefore, it was desirable that the system be installed under the supervision of men whose ability was known to the utility companies through other dealings. For these rea-

sons, it was decided that community equipment should be sold with engineering services in order to foster the orderly growth of the industry on which the future of Jerrold depended." (187 F.Supp. at 556–557.)

It cannot be contended seriously that any of the above factors are present in this case. The control cables here in question are not nearly as complex as the electronics system in *Jerrold*. Other brand cables have been used, apparently without any problems, with O.M.C. mechanical and electric shift engines for a number of years. Neither is O.M.C.'s future in jeopardy by the disallowance of the tie-in nor is the entire industry threatened. *Jerrold* is not applicable to this case.

The second case in which the good will defense was successful and upon which O.M.C. relies is Dehydrating Process Co. v. A. O. Smith Corp., supra, 292 F.2d 653. In that case the defendant had sold its silos and silo unloaders separately for seven years. The undisputed evidence showed that the defendant, during that seven year period, had received complaints from 50 per cent of its customers who had purchased unloaders separately and had used them with silos of other manufacturers. Based on the 50 per cent complaint rate, the defendant adopted the policy of tying together the sale of its silos and unloaders. The Court upheld the tie because, by showing that the 50 per cent complaint rate was the stimulus for instituting the tie, the defendant had sustained its burden of proof on the business justification or good will defense.

The factual distinctions between the *Dehydrating* case and the case at bar are readily apparent. With over 6,000 dealers in the country, O.M.C. has presented no evidence of customer dissatisfaction where an O.M.C. electric shift outboard or stern drive engine was used with control throttle cables manufactured by others.

The Court therefore finds no reasons, technical or economic, on which to accept the tie-in of control cables and engines

as a business necessity for the protection of O.M.C.'s good will. The Court does not hold that O.M.C.'s cable specifications are unreasonable. It simply holds that O.M.C. has failed to present sufficient proof to justify its practice of tying control cables to the sale of its electric shift outboard and stern drive engines. Whatever protection to its good will O.M.C. believes is necessary can be obtained by way of specifications. Mr. Shimanckas, O.M.C.'s cable expert, testified that he could write a specification that would be sufficiently clear and complete, so that it would read only on cables that were good enough to fully protect O.M.C.'s engines. (Tr. 1804–1808; PDX 85, 94.) Indeed, O.M.C.'s policy and procedure statements point out that such specifications are a viable alternative. (Stip. Fact 37; PDX 85, 94.) Accordingly, since cable specifications are not impossible or impractical to prepare, the tie-in sales of cables with electric shift outboard and stern drive engines cannot be justified as a practice necessary to protect O.M.C.'s good will. Standard Oil Co. v. United States, supra, 337 U.S. at 305–306, 69 S.Ct. 514, 2 L.Ed.2d 545; Susser v. Carvel Corp., supra, 332 F.2d at 519–520.

■ The Court concludes that O.M.C.'s practice of tying its sales of remote control throttle cables with its sales of electric shift outboard and stern drive engines constitutes a violation of Section 3 of the Clayton Act.

## II. TIE-IN SALES OF ELECTRIC SHIFT CONTROL BOXES WITH ELECTRIC SHIFT ENGINES.

N.W. has also charged that O.M.C. violated Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14, by illegally tying the sales of its electric shift control boxes to its electric shift outboard and stern drive engines. O.M.C. concedes that it sells its remote control boxes

in a unit package with both types of electric shift engines and that the ties "affect a substantial volume of commerce." (Stip. Facts 7, 55.) O.M.C. relies on the same two defenses discussed in Part I of this opinion to justify the tie-in. In addition, however, O.M.C. has challenged N.W.'s standing to bring this action for treble damages under 15 U.S.C. § 15 or for injunctive relief under 15 U.S.C. § 26. Because the Court finds that a determination of the standing issue will be dispositive of this phase of the case, the Court turns to a consideration of that question.[13]

### A. Standing To Sue For Treble Damages.

■ In order for N.W., a private litigant, to have standing to bring an action for treble damages under 15 U.S.C. § 15, it must demonstrate an "intention and preparedness" to engage in the electric shift control box business from which it claims to have been excluded by O.M.C.'s illegal conduct.

The leading case in this Circuit which applied the above rule is Triangle Conduit & Cable Co. v. National Electric Products Corp., 152 F.2d 398 (C.A.3, 1945). In that case the Court held that the plaintiff, who manufactured cable bushings for its own use, failed to establish that it intended and was prepared to go into the business of producing and selling bushings to outside cable manufacturers. Thus, the dismissal of the action was affirmed because the plaintiff lacked standing. The Court stated:

"The section of the anti-trust laws * * * referred to [15 U.S.C. § 15] has the limited purpose of affording compensation to those who have at least the intention and preparedness of engaging in a designated business and who are actually injured in their business or property by an unlawful act. The situation of such plaintiff

13. Prior to and during the trial O.M.C. moved to dismiss N.W.'s claim contained in the amended complaint pertaining to the electric shift control boxes on the ground N.W. lacked standing to sue. The Court reserved decision on the motion until after trial.

must be different from that of the general public."

\* \* \* \* \* \*

"The plaintiff designed and perfected its machine in order to manufacture its own bushings and that is just what it has been doing ever since that time. At most an anti-trust violation has been presented with no injury to plaintiff by reason thereof. \* \* \* It is not vital under the statute to aver an injury to a specific going business but as said in the leading and controlling decision of American Banana Co. v. United Fruit Co., 2 Cir., 166 F. 261 at page 264: '\* \* \* it is necessary to state facts showing an intention and preparedness to engage in business.' Plaintiff does not meet this test \* \* \*." (152 F.2d at 399–400.)

Numerous other cases have applied the principle that there be an intention and preparedness to enter a particular business activity. Martin v. Phillips Petroleum Co., 365 F.2d 629, 633 (C.A.5, 1966), cert. denied 385 U.S. 991, 87 S.Ct. 600, 17 L.Ed.2d 451 (1966); Volasco Products Co. v. Lloyd A. Fry Roofing Co., 308 F.2d 383, 395–396 (C.A.6, 1962), cert. denied 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (1963); Lawlor v. National Screen Service Corp., 270 F.2d 146, 152–153 (C.A.3, 1959), cert. denied 362 U.S. 922, 80 S.Ct. 676, 4 L.Ed.2d 742 (1960); Denver Petroleum Corp. v. Shell Oil Co., 306 F.Supp. 289, 307 (D. Col.1969); Waldron v. British Petroleum Co., 231 F.Supp. 72, 81–82 (S.D.N.Y. 1964); Deterjet Corp. v. United Aircraft Corp., 211 F.Supp. 348, 353 (D.Del. 1962); Delaware Valley Marine Supply Co. v. American Tobacco Co., 184 F.Supp. 440, 443–444 (E.D.Pa.1960), aff'd 297 F.2d 199 (C.A.3, 1961), cert. denied 369 U.S. 839, 82 S.Ct. 867, 7 L.Ed.2d 843 (1962). A simple hope or expectation to enter a business is clearly insufficient. Peller v. International Boxing Club, Inc., 227 F.2d 593, 596 (C.A.7, 1955); Image and Sound Service Corp. v. Altec Service Corp., 148 F.Supp. 237, 239 (D.Mass. 1956). A mere subjective intent to establish a new enterprise or to expand an already existing business is not enough on which to base standing to sue; there must be overt and objective preparations. Martin v. Phillips Petroleum Co., supra, 365 F.2d at 632–634; Volasco Products Co. v. Lloyd A. Fry Roofing Co., supra, 308 F.2d at 395–396; William Goldman Theatres, Inc. v. Loew's Inc., 69 F.Supp. 103 (E.D.Pa. 1946), aff'd 164 F.2d 1021 (C.A.3, 1948), cert. denied 334 U.S. 811, 68 S.Ct. 1016, 92 L.Ed. 1742 (1948); Pastor v. American Telephone & Telegraph Co., 76 F. Supp. 781 (S.D.N.Y.1940).

Applying the "intention and preparedness" test to this case, the Court concludes that the evidence does not support a finding that N.W. intended or was prepared to enter the electric shift control box market. Indeed, the Court finds that the relevant record evidences a contrary intent.

N.W. has never manufactured and put on the market any device activated by electricity. (Tr. 326.) The company is primarily a cable producer (Stip. Fact 69), and at no time over the past ten years has N.W. considered producing electric shift control boxes. In the summer of 1961, John G. Ford ("Ford"), an employee of N.W., learned of O.M.C.'s electric shift engines, and he, without authorization, worked up a very rough sketch of a device to adapt N.W.'s mechanical control box for use with an electric shift engine.[14] (Stip. Fact 70.) Ford also, without authority, made a hacksaw mock-up of his idea from a N.W. mechanical control box. (Stip. Fact 71.) As sketched, however, the proposed control box visualized by Ford could not operate O.M.C.'s electric shift engines. (Stip. Fact 70.) Furthermore, had Harry E. Shontz ("Shontz"), N.W.'s President, known what Ford was suggesting, he would have stopped Ford from making the mock-up of the control box. (Stip. Fact 71.) In fact, Shontz

---

14. The sketch was a rough pencil drawing in Ford's notebook. (DDX 61, pages 33–34.)

testified that N.W. during that period of time did not have the capital to expend on such a project. (Tr. 337–341.)

Nevertheless, N.W. claims that its conduct during the relevant time period clearly demonstrated an intent and preparedness to enter the electric shift control box market. The Court finds no merit in that argument. The negotiations between N.W. and Fall River Controls,[15] Electro Marine Company, and Witney Buddo, which were conducted in the early 1960's, concerned single lever control boxes designed for use with mechanical shift engines. (Stip. Fact 74). These negotiations occurred before Shontz had any knowledge of O.M.C.'s electric shift control box, and they were not undertaken with the view towards entering the electric shift control box business. (Tr. 311, 368.) Even if such preliminary discussions had been concerned with electric shift control boxes, it would not change the situation because mere preliminary negotiations do not constitute a showing of an intention and preparedness to enter a market. Peller v. International Boxing Club, Inc., supra, 227 F.2d at 595. Neither does the Court find any significance in the fact that Mr. Robert G. Cooper, N.W.'s manager of marine sales, requested, on the average of twice a year, that N.W. introduce a single lever remote control box that could be used with both electrical and mechanical shift engines. (Tr. 685, 703.) The Court can not infer from these entreaties any intention or preparedness on the part of N.W. to enter the relevant market.

But aside from the above, N.W. failed to take any substantial affirmative action which would have been necessary for entry into the electric shift control box market. N.W. never conducted a patent search to determine what patents existed pertaining to electric shift control boxes. (Stip. Fact 75; Tr. 343–

344.) N.W. never disassembled or directed anyone else to disassemble the lower unit of an O.M.C. electric shift outboard engine in order to determine the manner of its interworkings. (Stip. Facts 76, 80; Tr. 363–365.) Until the fall of 1970 N.W. never examined one of O.M.C.'s electric shift control boxes (Stip. Fact 77), and it was not until January, 1971 that N.W. subjected one of the boxes to any form of testing. (Stip. Fact 78.) N.W. neither hired anyone nor brought any machinery to produce such boxes. (Tr. 367.) Other than Ford's primitive mock-up, N.W. has never developed any kind of design or prototype of electric shift control box. (Tr. 327–328.) [16] N.W. has never undertaken any steps to determine whether it is economically feasible for it to enter that market.

Other significant factors which indicate N.W. had no desire to expand its operations into the electric shift control box market are shown by N.W.'s experience in the related mechanical shift box market. N.W. is the only manufacturer that does not market the more complicated single lever control box for mechanical shift engines. (Tr. 311.) N.W. has made no attempt to adapt its two-lever mechanical box for use with Mercury engines. The sole reason given for not pursuing that market is that Mercury boxes are too competitively priced. (Tr. 318–320.) Despite that fact, N.W. brings the present claim concerning electric shift control boxes without presenting any evidence that N.W. can make an electric shift box that would be competitively priced. Furthermore, N.W.'s own experience with mechanical shift control boxes designed for use with O.M.C.'s mechanical shift engines appears to be a failure. In this untied market N.W. has had little success. Shortly after its mechanical boxes were marketed, N.W. had to recall many of

15. Fall River Controls is a Division of the Hein. Weurner Corporation.

16. There are at least three manufacturers other than O.M.C. who market mechanical shift control boxes designed for use with O.M.C.'s electric shift engines. (Tr. 1324, 2169–73; PX 351, 352, 353.)

them for the purpose of replacing a defective part. The recall cost N.W. $25,000 to $30,000. (Stip. Fact 85.) Since that time the sale of N.W.'s mechanical control boxes has decreased sharply while the sale of N.W.'s cables for the same engines has increased. (Stip. Facts 82–83; Tr. 324–326.) While the above facts do not conclusively negate N.W.'s contention that the company was about to enter the electric shift control box market, they do shed light upon N.W.'s general attitude regarding the control box market.

The composite picture drawn from all the above facts is that N.W. has never, either presently or at any time prior to this suit, seriously entertained the notion of entering the electric shift control box market or was prepared to do so. Two additional facts strengthen this conclusion. First, in June 1966, N.W. complained to the Federal Trade Commission about O.M.C.'s practice of tying remote control cables to its electric shift engines but said nothing concerning the tie of the electric shift control boxes. (DX 34, p. 3.) Second, while this action was commenced June 16, 1969, it was not until November, 1970, that the complaint was amended to include the claims relating to the electric shift control boxes. (Tr. 372–373.) Thus, it appears that N.W.'s claim with respect to electric shift control boxes is a recent afterthought.

B. Standing To Seek Injunctive Relief.

■ While the right of a private litigant to sue for treble damages is strictly construed, Westor Theatres v. Warner Bros. Pictures, 41 F.Supp. 757, 762 (D.N.J.1941), the test for standing to seek injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, is less exacting. The latter Section providing for injunctive relief "was enacted by the Congress to make available equitable remedies previously denied private parties," and it "invokes traditional principles of equity and authorizes injunctive relief upon the demonstration of 'threat-

ened' injury." Zenith Radio Corp. v. Hazeltine, 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1968). The standing requirement is not predicated on a plaintiff's having already suffered actual injury, Bedford Cut Stone Co. v. Journeymen Stone Cutters' Assn., 274 U.S. 37, 54–55, 47 S.Ct. 522, 71 L.Ed. 916 (1927), because "he need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue to recur." Zenith Radio Corp. v. Hazeltine, 395 U.S. at 130, 89 S.Ct. at 1580, *accord:* United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); United States v. Oregon State Medical Society, 343 U.S. 326, 333, 72 S.Ct. 690, 96 L.Ed. 978 (1952); Swift and Co. v. United States, 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518 (1905); Bedford Cut Stone Co. v. Journeymen Stone Cutters' Assn., supra, 274 U.S. at 54, 47 S.Ct. 522. Thus, in order for this Court to invoke the traditional principles of equity and grant injunctive relief, N.W. must prove such a "threatened injury."

■ The general rule in equity is that injunctive relief against threatened conduct that is likely to cause loss or damage will not be granted to a private litigant where the injury complained of is of a public nature. 6 Toulmin's Anti-Trust Laws § 16.79, (1951). When a private litigant brings a suit for injunctive relief that litigant must show a threatened injury for which he has no adequate remedy at law, and he "must establish his right to redress for the particular wrong done to him." Zenith Radio Corp. v. Radio Corporation of America, 106 F.Supp. 561, 576 (D.Del. 1952). One of the best statements of the law on this point appears in Ring v. Spina, 84 F.Supp. 403, 406 (S.D.N.Y. 1949), where the Court stated:

"Plaintiff is entitled to injunctive relief which would protect him against prospective damage. 15 U.S.C. § 26. Such damage arises when there is danger of interference with rights or privileges he *now enjoys,* not merely

as a member of the general public, but as one engaging in the commerce which is being restrained." (Emphasis added.)

Furthermore, it is not enough to merely assert that certain acts will inflict irreparable injury. It is necessary that a plaintiff present facts "from which the court can reasonably infer that such would be the result." Cruickshank v. Bidwell, 176 U.S. 73, 81, 20 S.Ct. 280, 284, 44 L.Ed. 377 (1899). Nor does it matter that the act complained of may be illegal.

> "Suitors may not resort to a court of equity to restrain a threatened act merely because it is illegal or transcends constitutional powers. They must show that the act complained of will inflict upon them some irreparable injury." United Fuel Gas Co. v. Railroad Commission, 278 U.S. 300, 310, 49 S.Ct. 150, 152, 73 L.Ed. 390 (1929).

▮ In the instant case, the Court, assuming that the tie-in of electric shift control boxes and engines to be illegal, finds that N.W. has not demonstrated a threat of injury sufficient to justify its request for injunctive relief. N.W. has failed to demonstrate that it stands in shoes any different from the rest of the public. In such instances, it is up to the Attorney General or a party that can adequately demonstrate a concrete threat of injury to enforce the antitrust laws.

The Court has heretofore found that N.W. has never had an intention or preparedness to enter the electric shift control box market before this suit was brought, (Section A supra), and since the commencement of this lawsuit, N.W. has not taken any steps to determine the economic feasibility of developing or marketing a control box for electric shift engines.[17] (Stip. Fact 73.) A mere subjective intent, assuming N.W. now has an intention to enter the market with its own electric shift control box, in the absence of any preparations whatsoever, will not justify the equitable relief of an injunction. This principle was made clear in Holiday Inns of America, Inc. v. B & B Corporation, 409 F.2d 614, 618 (C.A.3, 1969), where the Court stated:

> "We must protect that which is protectable, but, in so doing, we must limit the use of injunctive relief to situations where it is necessary to prevent immediate and irreparable injury. The dramatic and drastic power of injunctive force may be unleashed only against conditions generating a presently existing actual threat; it may not be used simply to eliminate a possibility of a remote future injury, or a future invasion of rights, be those rights protected by statute or by the common law."

In that case, which concerned the Holiday Inns of America, Inc.'s attempt to enjoin the defendant's use of its trademark, "Holiday Inn," the Court denied the plaintiff's requested relief despite facts showing a definite intent to expand its operations to the Virgin Islands.

> "* * * Holiday had no right to immediate relief because it failed to present sufficient evidence of present debasement of its protected mark, and although it established a strong case of a future likelihood of confusion if and when the identical marks would begin to compete in the same market area for identical services, the geographic location of these islands militates against a finding that there is a use by the defendant of that type of competitive commerce envisioned by Congress. Holiday has received two franchise applications and a request for the availability of a franchise for the operation of Holiday Inn motels in the U. S. Virgin Islands. At oral argument its counsel represented that these applications are being reserved until this litigation is determined. Be-

---

17. N.W. did draw up a list of parts needed for the manufacture of a hypothetical electric shift box. This was only done after one of O.M.C.'s interrogatories asked N.W. what it would cost to make such a hypothetical box. (Stip. Fact 73; Tr. 343.)

cause we have decided that if and when Holiday does commence such operations there will be a likelihood of public confusion, it would then be entitled to the relief granted by the district court." (409 F.2d at 618–619.)

The Court concludes that since N.W. has failed to prove a significant threat of injury from O.M.C.'s tie-in of electric shift engines and electric shift control boxes, assuming the illegality of the tie, N.W. lacks the necessary standing to seek injunctive relief in a private capacity. Coupling this holding with that finding that N.W. lacks standing to sue for treble damages, the Court concludes that N.W.'s claims with respect to electric shift control boxes are without merit and should be dismissed.

## III. TIE-IN SALES OF CONTROL BOXES TO MECHANICAL SHIFT ENGINES THROUGH COERCIVE PRESSURE TACTICS ON DEALERS.

N.W. for the first time during the fourth day of trial leveled the charge that O.M.C. in 1962 initiated a practice of illegally tying the sale of its control boxes with its mechanical shift engines in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14. N.W. claims that these tie-in sales were accomplished by O.M.C. applying coercive pressure upon its engine dealers to buy O.M.C.'s control boxes, rather than a competitor's boxes.

Of course, an illegal tie-in need not be accomplished by a formal contractual provision; it can be inferred from a persistent and deliberate course of coercive dealing through misrepresentation, sabotage and threats of cancellation. Advance Business Systems & Supply Co. v. SCM Corporation, 415 F.2d 55, 63–64 (C.A.4, 1969), cert. denied, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970). However, the evidence in this case fails to sustain the charge that O.M.C. engaged in such illegal activity. Indeed, the circumstances and arguments on which N.W. relies in support of this contention lead to an opposite conclusion.

N.W. argues that, in order to persuade its engine dealers to sell its accessories with mechanical shift engines, O.M.C. threatened the cancellation of its engine franchises, threatened that parts deliveries would be delayed, and otherwise threatened economic sanctions against the dealers. N.W. never established that this pressure was differentiated as between control boxes for mechanical shift engines, on the one hand, and untied cables, on the other. In fact, N.W. does not contend that O.M.C. focused its unlawful pressure on promoting its mechanical shift boxes and not on control cables. Instead N.W. appears to argue that the pressure was uniform, applying to both boxes and cables, but that since N.W. had been selling cables longer than control boxes, it had a toe-hold in the market for cables, a position of strength that it did not enjoy in the box market.

The evidence, however, does not support such an argument. N.W. had been selling O.M.C. control boxes since 1961 (Stip. Fact 11), prior to the time O.M.C. began its allegedly coercive pressure tactics. Those control box sales were at least respectable for the first two or three years, but box sales then fell off sharply, allegedly because O.M.C.'s pressure tactics began to become effective. The problem with this conclusion is that the kind of pressure claimed to have been uniformly applied would have been just as likely to restrain a dealer from selling competitive cables as competitive control boxes. But despite this undifferentiated pressure, the record is clear that N.W.'s sales of control cables steadily grew both in volume (Stip. Fact 83; Ans. to Def's Int. 54—Docket Item 94) and in percentage of the market. (DX 82, p. 1.) This contrasts markedly with N.W.'s sales of mechanical shift control boxes, (Stip. Fact 82; Ans. to Def's Int. 54; DX 82, p. Ia).

The record appears clear that there were a number of reasons for this different experience, none of them remotely

related to any unlawful pressure tactics on the part of O.M.C. First, N.W.'s box was a two lever box and was not as popular with the boating public as a single lever box. (Tr. 703–704.) Secondly, purchasers of marine engines ordinarily prefer the engine manufacturer's control box, not only because of color and styling but also because it is normal in the trade for a dealer to match an engine with the engine manufacturer's control box. (Tr. 2162–2164.) Thirdly, it is very likely that N.W. may have lost some of its good will by its first mistakes in the quality of its control box. N.W. suffered an initial set back in its attempt to sell its box. (Shontz Dep. 516–523—Docket Item 107.) In fact, N.W. was forced in the summer of 1961 to recall many of its mechanical shift control boxes for the purpose of replacing defective parts. (Stip. Fact 85.) It clearly appears that N.W.'s lack of success in the sale of its control boxes when compared to the sale of its cables is explained by the above factors rather than by any unlawful coercion on O.M.C.'s part.

A second major difficulty with N.W.'s pressure theory is that it ignores O.M.C.'s distribution system. O.M.C.'s Evinrude and Johnson Divisions manufacture and sell mechanical shift outboard engines under their respective trade names directly to engine dealers. (Tr. 1296–1297.) However, control boxes and cables to be used with such mechanical shift outboard engines are manufactured or purchased by O.M.C.'s Gale Products Division and sold by it to O.M.C.'s independent parts distributors, who in turn sell them to engine dealers. (Stip. Facts 12, 30c; Tr. 1327–1328.)

The undisputed evidence shows that Johnson and Evinrude salesmen are solely interested in selling engines. (Tr. 1211–1212; 1254–1255.) They have no interest in promoting O.M.C.'s sales of mechanical shift control boxes or cables as they receive no commissions or other incentives for such sales. (Tr. 1211; 1256–1257; 1302–1303; 1424–1425.) These salesmen would not risk losing an engine sale by trying to tie in a box and cable sale to a sale of a mechanical shift engine. (Tr. 1256–1257.) It is O.M.C.'s Gale Products Division, not O.M.C.'s Johnson and Evinrude Divisions, which profits from the sale of control boxes and cables sold for mechanical shift engines. (Tr. 2037–2039.) It was not until 1971, that Gale Products even had a sales force which visited the independent parts distributors to promote accessory sales. (Tr. 1322–23; 1327.) There is no evidence that Gale Products Division ever applied pressure on its distributors to force the sale of mechanical shift boxes with mechanical shift engines. Moreover, the parts distributors are independent business men whose practices and policies O.M.C. cannot control.

An analysis of the record indicates that N.W. has failed to prove a single instance in which an engine dealer's franchise was cancelled, a parts delivery was delayed, or any other sanction was applied because a dealer handled a competitive mechanical shift box or failed to purchase a sufficient number of control boxes from O.M.C. The record is barren of any proof that such sanctions were even threatened. In this regard, three of N.W.'s witnesses, Messrs. Stewart, Heely and Tochterman, had personal experience as O.M.C. dealers. Mr. Tochterman was not questioned regarding "pressure." Of the other two former dealers, the only pressure described by Mr. Heely was allegedly applied by O.M.C.'s independent parts distributors, and that had no overtones of coercion but merely of normal sales persuasion. (Tr. 458–459.) Mr. Stewart's testimony on this point was merely to answer "yes" to the question of whether O.M.C. applied "pressure or persuasion on its dealers" to use its control box and cable with its engine. (Tr. 430–431.)

Two other N.W.'s witnesses on pressure were independent marine distributors. One, Mr. Donald Clark, had previously been affiliated with one of O.M.C.'s parts distributors. He testified there was pressure, "not overt", and

it was applied by parts distributors not O.M.C. Furthermore, his explanation of "pressure" does not show coercion but only normal sales promotion. (Tr. 2175–2176.) The other independent distributor, Mr. Keller, was an O.M.C. competitor who had long done business with N.W. While he spoke of "pressure" in terms of threatening to cancel a franchise, his testimony was no more than second-hand knowledge based on hearsay. In any event, it was implicit from his testimony that he was of the opinion that any attempt at sales promotion carries an ultimate threat of franchise cancellation. (Tr. 635, 662–663.)

Two other witnesses testified who were affiliated with Great Lakes Products, a manufacturer of control boxes and cables sold in competition with O.M.C. Their testimony, although they spoke of "obstacles" having been interposed by O.M.C. to the sale of their control box, merely supports the conclusion that O.M.C. did no more than apply normal "sales pressure [to] * * * buy O.M.C.'s line." (Tr. 479, 484, 490, 495–496, 499–500, 503–505.)

The only other testimony adduced on the pressure issue was by Mr. Shontz, N.W.'s President, and Mr. Cooper, N.W.'s Sales Manager. Their testimony, however, amounted to no more than hearsay and totally unsupported conclusions. (Tr. 356–361, 519–521, 689–690, 694–697, 712–713, 787–788.) On the other hand, all of O.M.C.'s witnesses flatly denied the use of coercive pressure, and they continually warned their salesmen against such practices and provided a sales manual which proscribed such tactics. (Tr. 1209–1211, 1254–1256, 1264–1265, 1324–1325, 1424–1425, DX 135.)

The Court concludes that N.W. has failed to sustain its burden of proving the charge that O.M.C. engaged in a coercive course of conduct towards dealers amounting to the imposition of a tie of its control boxes to its mechanical shift engines. Indeed, the evidence compels the conclusion that the charge is baseless.

## IV.  REFUSAL TO PURCHASE.

N.W. has also charged that O.M.C. has violated Section 2 of the Sherman Act because it refused, under a policy allegedly adopted in 1960, to purchase cables from suppliers that maintain an independent distribution system selling cables in competition with O.M.C. N.W. contends that on three separate occasions, in October, 1961, (Tr. 108, 127–128), in December, 1964, (Tr. 672–675), and in May, 1968, (Tr. 678–684; DDX 32, 53, 54), O.M.C. refused to deal with N.W. as its cable supplier. The refusals to deal violate Section 2 of the Sherman Act, N.W. asserts, because they were prompted by O.M.C.'s intent to monopolize the cable market, or in the alternative, were motivated by O.M.C.'s desire to attempt to monopolize the cable market.

Before considering N.W.'s allegations or the defenses relied upon by O.M.C. pertaining to the alleged refusal to deal, the Court finds that a general discussion of Section 2 of the Sherman Act is necessary. That Section reads in part:

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, * * *." (15 U.S.C. § 2).

The law makes it illegal to "monopolize" or "attempt to monopolize," [18] and since the standards for finding an unlawful "monopolization" and an "attempt to monopolize" are different, they will be considered separately.

### A.  Monopolization.

In order to commit the forbidden act of monopolization under 15

---

18.  The Act makes it unlawful to "combine or conspire" to monopolize, but since there is no conspiracy issue involved in this case, the Court does not discuss this form of a Section 2 violation.

U.S.C. § 2, it is necessary that the party charged possess monopoly power. United States v. E. I. Du Pont De Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). "Monopoly power is the power to control prices or exclude competition," *Id.* at 391, 76 S.Ct. at 1005, from any part of the trade of commerce among the several States, or foreign nations. The mere possession of monopoly power, however, is not a violation of the law. United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); United States v. Aluminum Co. of America ("Alcoa"), 148 F.2d 416 (C.A. 2, 1945). There must be an intent to monopolize in order to violate Section 2 of the Sherman Act. The requisite intent is said to exist where there is merely the willful acquisition of such power or the conscious maintenance of it. United States v. Grinnell Corp., supra, 384 U.S. at 570–571, 86 S.Ct. 1698. It is not necessary that a specific intent to bring about the prohibited result be proved, United States v. Griffith, 334 U.S. 100, 105, 68 S.Ct. 941, 92 L.Ed. 1236 (1948); United States v. Aluminum Co. of America, supra, 148 F.2d at 432, nor must the Court find an actual exclusion of competitors from the market. The possession of monopoly power coupled with "the intent and purpose to exercise that power" is sufficient. American Tobacco Co. v. United States, 328 U.S. 781, 809, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1945). And since a monopolist does not monopolize unconsciously, the required intent is present if the "monopoly results as the consequence of a defendant's conduct or business arrangements." United States v. Griffith, supra, 334 U.S. at 105, 68 S.Ct. at 944:

"* * * § 2 of the Act is aimed, *inter alia,* at the acquisition or retention of

effective market control. See *United States* v. *Aluminum Co. of America,* 148 F.2d 416, 428, 429. Hence the existence of power 'to exclude competition when it is desired to do so' is itself a violation of § 2, provided it is coupled with the purpose or intent to exercise that power. *American Tobacco Co.* v. *United States,* 328 U.S. 781, 809, 811, 814 [66 S.Ct. 1125, 90 L.Ed. 1575.] It is indeed 'unreasonable, *per se,* to foreclose competitors from any substantial market.' *International Salt Co.* v. *United States,* 332 U.S. 392, 396 [56 S.Ct. 701, 80 L.Ed. 1085.] The anti-trust laws are as much violated by the prevention of competition as by its destruction. *United States* v. *Aluminum Co. of America, supra.* It follows *a fortiori* that the use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor, is unlawful." *Id.* at 107, 68 S.Ct. at 945.

In addition to finding the necessary intent to monopolize, it is incumbent upon the Court to determine that monopoly power exists. No adequate guide has ever been formulated to make the task simple. The existence of such power may ordinarily be inferred from the predominant share of the market a particular defendant possesses. United States v. Grinnell Corp., supra, 348 U.S. at 571, 86 S.Ct. 1698; American Tobacco Co. v. United States, supra, 328 U.S. at 791, 66 S.Ct. 1125. However, when the market power possessed by a party is not so large that monopoly power can be inferred,[19] the test is whether the defendant has the power to control prices or exclude competition. United States v. E. I. Du Pont De

---

19. The cases in which monopoly power has been inferred involved companies possessing extremely large percentages of the market. In United States v. Aluminum Co. of America, 148 F.2d 416 (C.A. 2, 1945), the defendant possessed 90% of the virgin aluminum market. In United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966), the defendant controlled 87% of the ac-

credited central station protection services. In American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1945), the appellant controlled over two-thirds of the entire field of domestic cigarettes and over 80% of the special field of comparable cigarettes. In cases involving the control of smaller percentages of the market such inferences cannot be made. Indeed, in United States

Nemours & Co., 351 U.S. 377, 389, 76 S.Ct. 994, 100 L.Ed. 1264 (1956).

In determining whether a party has the power to control prices or exclude competition, it is necessary for the Court to weigh all relevant factors, and apply the rule of reason. United States v. Columbia Steel Co., 334 U.S. 495, 527–528, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948).

"It is the consideration of the actual exercise of power—the business conduct of the defendant, in short, that the application of the Rule of Reason becomes important. Convenient as it would be to have a Rule of Thumb by which we could automatically determine the existence of monopoly power by measuring a defendant's percentage of production or of sales within the industry, the generality of the term 'monopolization' precludes any such arbitrary classification. We must still resort to the laborious process of balancing all factors and minutely examining the defendant's conduct to determine whether the requisite power to control prices or production or to exclude competitors exists." Johnston, "Monopolize or Attempt to Monopolize," An Antitrust Handbook. Section of Antitrust Law American Bar Assoc. 155 (1958).

### B. Attempt to Monopolize.

■ While a charge of monopolization requires monopoly power to be possessed and a general intent to monopolize, the indispensable element necessary to find an "attempt to monopolize" is a specific intent to destroy competition or to build a monopoly. Times-Picayune Publishing Co. v. United States, supra, 345 U.S. at 626, 73 S.Ct. 872, 97 L.Ed. 1277. A single defendant violates the "attempt to monopolize" clause if it can be shown that his motivation was to secure monopoly power. Six Twenty-

Nine Productions Inc. v. Rollins Telecasting, Inc., 365 F.2d 478, 484 (C.A. 5 1966). The attempt need not be successful. Its only requirement is that there be a dangerous probability that the attempt will be successful. Lorain Journal Co. v. United States, 342 U.S. 143, 153, 72 S.Ct. 181, 96 L.Ed. 162 (1951); American Tobacco Co. v. United States, supra, 328 U.S. at 785, 66 S.Ct. 1125; Cliff Food Stores, Inc. v. Kroger, Inc., 417 F.2d 203, 207 (C.A. 5, 1969).

■ In the instant case the Court finds that O.M.C. did not possess monopoly power of the relevant market at the time the company refused to accept N.W. as its supplier of cables. The relevant market, conceded by both O.M.C. and N.W., was for O-style cables sold for use with new engines as well as replacements. The criteria for establishing whether that market was monopolized is whether the defendant possessed the power to control prices or exclude competition. The Court finds that O.M.C. had neither the power to control prices or to exclude competition.

O.M.C.'s reduction of cable prices in 1961 and subsequent increase of cable prices in 1963 resulted not from a monopolistic position occupied by O.M.C., but rather as the result of justifiable business reaction to competitive market conditions. See Part V, infra.

The second criteria for determining the existence of monopoly power, the ability to exclude competition, was not possessed by O.M.C. N.W. argues that O.M.C. possessed such power because it was able to tie the sale of cables to electric shift engines, and because it refused to deal with N.W. as a supplier. These contentions are without foundation.

The fact that O.M.C. illegally foreclosed part of the cable market by tying cables and electric shift engines indicated

---

v. Aluminum Co. of America, supra, 148 F.2d at 424, J. Learned Hand stated that it was doubtful that 64% of the market would constitute a monopoly. And in United States v. United States Steel Corp., 251 U.S. 417, 40 S.Ct. 293, 64

L.Ed. 343 (1920) the defendant, although possessing nearly 50% of the market, was not held to have a monopoly even though it controlled much more of the market than did any one of its competitors.

that O.M.C. in fact lacked sufficient power in the cable market to have a monopoly. The very purpose of a tie-in is to enable one with economic power in the market for a particular product, that is, the tying product, to use that power to force the sale of another product, the tied product, in the market for which it does not possess that power. See Bowam, Tying Arrangements And The Leverage Problem, 67 Yale L.J. 19, 20–21 (1957); Turner, The Validity of Tying Arrangements Under The Antitrust Laws, 72 Harv.L.Rev. 50, 55–58 (1958); Northern Pac. Ry. v. United States, supra, 356 U.S. at 7–8, 11, 78 S.Ct. 514, 2 L.Ed.2d 545. The limited use of the tie-in in this case does not indicate that O.M.C. had monopoly power in the O-style cable market.

■ N.W.'s further allegation that O.M.C.'s exclusionary practice of refusing to deal with N.W. clearly demonstrated that O.M.C. had monopoly power is also without merit. While a refusal to purchase from a particular supplier who is also a competitor may inevitably foreclose that competitor from a share of the market, such a refusal is not unlawful unless motivated by a purpose to create a monopoly, or to maintain a monopoly already possessed.

"The purpose of the Sherman Act is * * * to preserve the right of freedom to trade. In the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal. And, of course, he may announce in advance the circumstances under which he will refuse to sell." United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919).

It is manifestly clear that in this particular case, unless the Court is faced with an attempt to monopolize, a refusal to deal is unlawful only if the refusal was motivated by a desire to maintain an existing monopoly. Thus it was incumbent upon N.W. in this action to present further facts from which monopoly power could be found. This N.W. has failed to do. The Court cannot accept N.W.'s circular argument that O.M.C.'s refusal to deal was illegal because it had monopoly power, and that O.M.C. had monopoly power because it refused to deal.

■ In contrast to N.W.'s inability to present facts from which monopoly could be demonstrated, there are several factors which militate against a finding that O.M.C. possessed monopoly power at the times the company refused to deal with competitors.[20] Before 1959, O.M.C. was the only source of remote control cables for use with O.M.C. engines. (Tr. 1042–1044.) At that time O.M.C. was in the possession of a monopoly solely as the result of historical accident. See United States v. Grinnell Corp., supra, 384 U.S. at 571, 86 S.Ct. 1698. It did not last. In 1969 N.W. began to compete with O.M.C. for cable sales, and shortly thereafter, Teleflex, Inc. began to market cables in competition with O.M.C. Both companies have competed with O.M.C. up to the present. (Stip. Facts 11, 26; Tr. 2125–2127, 2131.) In addition to the above mentioned companies, Morse Controls has since 1962 competed with O.M.C. for the sale of the cables in question. (PDX 22–29.) Thus, at no time in the historical development of the cable market, excluding the illegal tie-in of cables with electric shift engines, does it appear that O.M.C. ever possessed the power to exclude competitors. In fact, the rapid growth of competition in the mechanical shift cable market evidences the lack of such power.[21]

20. O.M.C. initially ceased dealing with Teleflex, Inc., a supplier of cables, when that company began to compete with O.M.C. for the sale of O-style cables. This occurred some time during the fiscal year 1960–1961. (Stip. Fact 12.)

21. The Court focuses on the untied market because any power to exclude competitors with respect to cables sold in the electric shift engine market was a function of O.M.C.'s power in the engine market not in the cable market. It is in this market

In addition to the above facts, between 1960 and 1968, O.M.C.'s cable sales for mechanical shift engines plummeted. In 1960, O.M.C. sold 282,772 cables for use with mechanical shift engines. In 1968 this figure had fallen to 41,840 cables,[22] 29.30 per cent of the market for cables used with mechanical shift engines. It has only been since 1967 that O.M.C.'s percentage of the market for such cables has increased. (DX 82, p. II.)

Upon considering all the relevant facts, applying the rule of reason, and excluding from consideration cables involved in the tie-in where the power to exclude competition was a function of O.M.C.'s dominance in the engine market, the Court finds that O.M.C., while once innocently in a position of monopoly, did not have the power to exclude competitors from the cable market at the times of the alleged refusals to deal with N.W.[23]

■ If O.M.C.'s refusals to deal with N.W. violate Section 2 of the Sherman Act, it is because such refusals were specifically intended to facilitate O.M.C.'s attempt to monopolize the O-style cable market. Times-Picayune Publishing Co. v. United States, supra, 345 U.S. at 626, 73 S.Ct. 872, 97 L.Ed. 1277. The Court, however, after considering all the relevant facts, finds that N.W. has failed to prove that O.M.C.'s actions were motivated by a specific intent to attempt to monopolize. Although N.W. has offered proof of a number of facts that could in the aggregate, when considered out of context of business reality, imply a specific intent to monopolize, the Court concludes that O.M.C.'s refusals to accept N.W. as a cable supplier were motivated by sound business reasons and were not meant to destroy competitors.

■ As heretofore discussed, in the early 1960's O.M.C. faced stiff competition from N.W., Teleflex, and Morse Controls. The defendant was not in the possession of monopoly power and was thus unable to prevent the rapid growth of competition. The competition, at that time, was so successful that the defendant's share of the market rapidly waned. Faced with that state of affairs, the Court finds that O.M.C. exercised reasonable business judgment in refusing to purchase from N.W. which was, at the time of the initial refusal to deal, engaged in a competitive struggle with O.M.C. for the sale of O-style cables. While O.M.C.'s actions may have been rough on N.W., it is clear that neither rough nor unethical competition is a sufficient basis on which to rest a finding of a violation of Section 2 of the Sherman Act.

" * * * an essential element of an attempt to monopolize * * * is a specific intent to destroy competition or build a monopoly. * * * neither rough competition nor unethical business conduct is sufficient. The requisite intent to monopolize must be

---

that N.W.'s President, Shontz, admitted that the company has been able to compete. (Tr. 787–788.) It is in this market that O.M.C.'s monopoly power must be assessed.

22. In 1968 O.M.C.'s total cable sales were 97,477. The other 55,637 cables were used with O.M.C. electric shift engines.

23. It is the percentage of the market O.M.C. possessed at the time it refused to deal with N.W. that is relevant to N.W.'s contention that the refusal to deal with N.W. was made when O.M.C. had monopoly power. At the time of O.M.C.'s first refusal to deal with N.W., O.M.C. controlled 68.09% of the cable market. The Court does not believe, in light of the above facts, that that percentage of the market was sufficient from which monopoly power could be inferred. The Supreme Court in United States v. Grinnell, 384 U.S. 563, [86 S.Ct. 1698, 16 L.Ed.2d 778] (1966), found that 87% of the accredited central station business was sufficient power from which monopoly could be found. That Court, however, stated:

"The existence of such power ordinarily may be inferred from the predominant share of the market." 384 U.S. at 571, 86 S.Ct. at 1704.

The Court did not hold that a high percentage of the market must always indicate monopoly power. In this case the Court finds that the facts indicate that O.M.C. was not in possesion of such power at the time it refused to deal with N.W. Thus, the Court declines to infer a monopoly from the 68.09 per cent of the market O.M.C. possessed in 1961.

present and predominant." American Football League v. National Football League, 205 F.Supp. 60, 64–65 (D.Md. 1962), aff'd 323 F.2d 124 (C.A. 4, 1963).

The Court has found no authority holding that a buyer, lacking monopoly power, must undermine its own business by buying from a supplier that sells a seemingly identical product at a lesser price in competition with the buyer. In fact, the law supports just the opposite position. In F. T. C. v. Raymond Bros.-Clark Co., 263 U.S. 565, 44 S.Ct. 162, 68 L.Ed. 448 (1924), the Federal Trade Commission alleged that the defendant, a grocery wholesaler, was engaged in an unfair method of competition in violation of Section 5 of the Trade Commission Act because it refused to continue its purchases from a manufacturer that had begun to sell to a competitor of the defendant. The Supreme Court, in holding that in the absence of any element of conspiracy, monopoly or oppression, the refusal to purchase was proper, stated:

"It is the right, 'long-recognized,' of a trader engaged in an entirely private business, 'freely to exercise his own independent discretion as to parties with whom he will deal.' United States v. Colgate & Company, 250 U.S. 300, 307 [39 S.Ct. 465, 63 L.Ed. 992.] [Other cites omitted]. Thus a retail dealer 'has the unquestioned right to stop dealing with a wholesaler for reasons sufficient to himself.' Eastern States Retail Lumber Association v. United States, 234 U.S. 600, 614 [34 S.Ct. 951, 58 L.Ed. 1490;] United States v. Colgate & Company, supra, 250 U.S. 307, [39 S.Ct. 465.] He may unlawfully make a fixed rule of conduct not to buy from a producer or manufacturer who sells to consumers in competition with himself. Grenada Lumber Company v. Mississippi, 217 U.S. 433, 440 [30 S.Ct. 535, 54 L.Ed. 826.] * * * Likewise a wholesale dealer has the right to stop dealing with a manufacturer 'for reasons sufficient to himself.' And he may do so because he thinks such manufacturer is undermining his trade by selling either to a competitor wholesaler or to a retailer competing with his own customers." Id. at 573, 44 S.Ct. at 164.

In addition to the above justification, the Court finds that there was a sound engineering reason behind O.M.C.'s refusal to accept N.W. as a cable supplier. O.M.C.'s engineers had promulgated specifications for its cables that they believed were necessary to insure the quality level of the cables that O.M.C. sold. These specifications were meant to produce a superior cable since an inferior cable was thought to cause harm to an engine, in which case, one would be apt to blame the engine for any malfunctioning that resulted. (Tr. 1678–1679, 1908, 2000–2001.)

N.W. contends that O.M.C. deliberately misused its publicized specifications [24] so that it could refuse to deal with suppliers marketing competing cable. N. W.'s argument is as follows: In the fall of 1960 the defendant made a policy decision not to purchase cables from any supplier that was also a competitor. The purpose of this decision was to destroy the threatened competition represented by such suppliers. Acting pursuant to that policy, O.M.C. began to engage in a "grand charade." It tested cables of many vendors, using the "published" backlash standard as a means of rejecting the cables of competitors and an "unpublished" standard as a means of approving cables of non-competitors. N.W. was treated as a competitor and as such was unaware that it could have met the unpublished standard. If it had not been for O.M.C.'s manipulation of the backlash standard, the defendant would have purchased cables from N.W.

The Court does not view O.M.C.'s actions in the same manner as N.W. The evidence presented in the case does not support N.W.'s claim that O.M.C.'s entire program of specifications and test-

24. O.M.C.'s engineering specification #257. (PX 116.)

ing was nothing more than a cover-up for an attempted monopolization of the O-style cable market. The Court does not find that the defendant engaged, as the record shows it did, in the substantial testing of at least ten different manufacturers' cables over the course of a number of years solely as a facade for its practice of not buying from competitors so that it could monopolize the market for O-style cables. The records show that prior to the inception of this case the defendant tested, on at least one occasion and frequently more often, cables manufactured by the following: N.W. (DDX 11, 22, 25; DX 30, 55, 83, 87, 89; PDX 120-A, 121), ACCO (DX 90; PDX 119, 150), Bergen Wire Rope Company (PDX 106), Condex Corp. (DX 92; PDX 154), Great Lakes Products (DX 94; PDX 163), Marmac (DX 95), Morse (DX 96-100), Red Jacket (DX 101), Robin Tech (DX 102-105), Servex (DX 106), Shakespeare (DX 107-109), and Teleflex (DX 110). The test and memoranda cited above cover the period from August 8, 1960 to June 26, 1968.

Furthermore, N.W.'s President admits to having received shortly after the tests whose results they summarized, at least three test reports which stated his backlash to be satisfactory although substantially above the maximum allowed by the original specifications. (Tr. 403-406, 2256-2257.) Those reports indicated backlashes of .106 inches (DDX 11), .103-.102 inches (DDX 22), and .097 inches (DX 55), as opposed to the maximum of .0625 inches in O.M.C.'s original backlash specification. (PDX 117.) In light of that admission, the Court finds N.W.'s argument concerning "published" and "unpublished" specifications lacking in credibility.

It appears from the evidence submitted that one of the primary reasons N.W.'s cables were never purchased by O.M.C. was that N.W. never really tried to meet O.M.C.'s specifications. N.W. has focused on one specification, backlash, in support of its argument. The plaintiff ignores the fact that it voluntarily elected to leave off the following

features found on O.M.C.'s cables: inner seals, annealed ends of the core wire, lubrication and polishing of the core wire, and O-rings in the nylon slider guides which prevent moisture seepage into the cable. (Tr. 57-61, 72-78, 99-104, 532, 542-544, 592-595, 2202-2203, 2251-2254, 2279-2280, 2302-2310; DDX 11, 22; DX 55.) Furthermore, since 1962, N.W. has actually ceased trying to meet defendant's "efficiency" standard. (Tr. 386, 541-544.) In short, N.W. has utterly failed to establish that O.M.C.'s refusal to deal with N.W. was motivated by anything other than sound business practices.

## V. PRICE MANIPULATION

N.W. further charged that O.M.C. in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, engaged in anti-competitive price manipulations in 1961 and 1963 with the intent of driving N.W. out of business. Specifically, N.W. contends: (1) that O.M.C. in 1961 and 1963 was a monopolist in the O-style control cable market, (2) that O.M.C. exercised its monopoly power in an attempt to destroy N.W. as a competitor, (3) that this exercise of monopoly power consisted of a predatory price cut in 1961, followed in 1963 by a price increase which O.M.C.'s market power prevented N.W. from following, (4) that N.W. was injured by the price changes, (5) that the injury occurred during the four year statutory damage period, as well as prior to that time, as a result of O.M.C.'s ten year old price cut, and (6) that N.W. is entitled to recover for such injury losses incurred during the statutory damage period.

### A. The 1961 Price Reduction.

It is apparently conceded that as a result of historical accident—the development of larger horsepower outboard engines and the growing popular demand for remote controls by the public— O.M.C. found itself in the late 1950's unwittingly as the only significant seller of O-style cables and hence the possessor of a monopoly without, in any way, having intended to prevent competition from

arising where none had existed before. But this position of dominance was short-lived. By January, 1961 two other O-style cable manufacturers had entered the cable market giving stiff competition to O.M.C. where none had existed before.

The first competitor was N.W.'s predecessor, North Wales Tubing Company, which started business in 1958. (Tr. 31–37.) It first fabricated tubing for some brass, stainless steel and plastic tubing companies. (Tr. 38.) It also started off making marine parts and cable-end fittings for several companies, one of which was Teleflex, Inc. (Tr. 32, 39.) In 1959 N.W.'s predecessor entered the remote marine cable manufacturing field, becoming the first cable manufacturer to compete with outboard engine manufacturers for the sale of cables. (Tr. 39; Stip. Fact 11.) N.W. then immediately set up its own distributor system to compete with these outboard engine manufacturers in the remote control cable business. (Tr. 32, 39.)

O.M.C. has never manufactured remote cables and has only sold cables which it purchased from outside suppliers. American Chain & Cable Co. was O.M.C.'s original supplier of cable and has continued so to date. During the fiscal years 1959 and 1960 (October to September), O.M.C. also purchased remote cables from a second supplier, Teleflex, Inc. (Tr. 2125; Stip. Fact 12.)

By the fall of 1960, N.W.'s entry into the cable market was having a telling effect. Teleflex, upon learning that N.W. was selling O-style cables to distributors in the industry at a price considerably lower than O.M.C., approached O.M.C. with the idea of having O.M.C. reduce its cable prices so they would be more competitive with N.W. prices. (Tr. 2126, 2137.) Teleflex was convinced that if O.M.C.'s cable prices were not lowered and made more competitive O.M.C. was going to lose the market,

causing Teleflex to lose business as an O.M.C. cable supplier. (Tr. 2126, 2137.) O.M.C. was not then convinced that it would lose business, but Teleflex "decided that the loss of business was so certain that Teleflex would undertake also to sell the O-style cables on the open market through [its] distributors." (Tr. 2126–2127.) Teleflex decided to compete despite the fact that it believed that it would lose O.M.C.'s cable account if it sold directly to distributors since such a situation would confront O.M.C. with a serious price problem. (Tr. 2138, 1409.)

In addition to the above, Teleflex's decision to become an O.M.C. competitor created another competitive problem; Teleflex could advertise that its cables sold on the market were identical to those supplied to O.M.C. (Tr. 1405–1410; PDX 36.) Also, at the time Teleflex entered the market through its distributors, O.M.C. had high inventories of such unsold cables. (Tr. 1250; PDX 36.)

It was in late 1960 and early 1961 that O.M.C. decided that its cable prices had to be reduced to meet competition in the market from both N.W. and Teleflex. O.M.C. thus determined to decrease the *list* price of its O-style cables but to retain its discount structure.[25] (Tr. 1405–1410; PDX 36.)

The applicable law relating to a price reduction was succinctly stated by the Court of Appeals for the Third Circuit in Gold Fuel Service, Inc. v. Esso Standard Oil Co., 306 F.2d 61, (C.A.3, 1962), cert. denied, 371 U.S. 951, 83 S.Ct. 506, 9 L.Ed.2d 500 (1963), as follows:

"Price reduction in a competitive situation is not a wrong in itself. It can become a violation * * * of Section 2 of the Sherman Act only if shown to be motivated by a specific intent to drive a competitor or competitors from the field." [306 F.2d 64]

25. Reducing the list price without changing the discount structure had the effect of reducing the price paid by the purchaser and also lowered the amount of profit which the distributors and dealers received on the sales price. (Tr. 1410.)

Therefore, the question to resolve is whether O.M.C.'s price cut was motivated by a genuine business desire to meet competition, or whether it was designed to squeeze N.W. completely from the market.

The extent of O.M.C.'s 1961 price cut must first be viewed in relation to the fact that O.M.C. was attempting to sell an inventory of cables made by Teleflex, while facing competition from the very same company. The competition for the sale of cables was so significant that N.W. also had to adjust its prices downward in October of 1960. (DDX 48, 49; Tr. 565–569.) After O.M.C.'s price cut, its distributor price for a 12-foot cable [26] was $4.35, whereas its cost of purchase of the same cable from its suppliers at the same time was $3.42. (Tr. 2048–2049; DX 80.) Thus, the distributor price was not intended to be below cost but was fixed in anticipation of stopping sales decline and meeting competition. (PDX 36.) O.M.C.'s $4.35 distributor price was fifteen cents less than N.W.'s distributor price of $4.50, and this meant that O.M.C.'s suggested dealer price would be $5.10. (Tr. 2049–2050; PDX 49; DX 80.) O.M.C. believed at the time that the critical prices to compare were O.M.C.'s dealer price of $5.10 with N.W.'s distributor price of $4.50. (Tr. 1406; 1274–1276.) This was so because O.M.C. realized that N.W. in originally building its distributor organization gave dealers distributor prices. (Tr. 590–592; 600–602.) N.W. still does this in some cases where it has retained direct dealers in some areas of the country. (Ans. to Def's Int. 32—Docket Item 16; Tr. 590–592, 648, 2293–2294.) In the light of the above, it was not unreasonable for O.M.C., in late 1960 and early 1961, to believe that in order to establish a competitive price for its cables, O.M.C. dealers price should be in a range to compete with N.W. distributor prices.

There appears to be little doubt that O.M.C.'s price reduction was simply an honest effort to reduce its cable prices to a reasonable range to be competitive with the cable prices of the two new competitors who had recently entered the market. Nevertheless, O.M.C.'s 1961 price reduction instituted to meet competition and prevent a decline of its sales was not particularly effective. By September 30, 1961, O.M.C.'s purchases of cables from suppliers were approximately one-half of the preceding year, and during the same period O.M.C.'s share of the O-style cable market (calculated on the basis of no replacement cables) dropped from 84 per cent to 68 per cent. (DX 82, p. 2.) Moreover, during the years 1961 to 1963, N.W. held, or slightly increased, its percentage of O-style cable market while O.M.C.'s percentage in this market dramatically declined from 84 per cent to about 51 per cent.

The Court, therefore, finds that O.M.C.'s 1961 price reduction was designed as a reasonable and necessary step to meet a competitive situation and was not motivated by an intent to drive O.M.C.'s competitors from the market.

### B. O.M.C.'s 1963 Price Change.

In April of 1963, O.M.C. raised its cable *list* price to that which existed prior to the 1961 price cut. (DX 80.) This list price rise was accompanied by a change in the discount structure, so that, in fact, the price O.M.C. received from its distributors was still significantly less than the comparable price received before the 1961 price cut. For example, a distributor price for a 14-foot cable before the 1961 price cut was $7.54, after the price cut it was $4.79, and after the 1963 price rise it was $5.85. (DX 140; Tr. 1483–86.) The reason for the change in the 1963 pricing policy was that the list price cut, which was made without changing the discount structure in 1961, failed to halt the decline in cable sales. The 1961 lower list price had simply resulted in lower profits to O.M.C.'s distributors and dealers since O.M.C. had retained its pre-

---

26. The twelve foot cable was the same length of cable used by the parties as a standard in this case.

1961 discount structure at the lower price. (Tr. 1250–1251, 1410–1411.)

As previously noted O.M.C.'s actual unit cable sales between 1961 and 1963 had dropped because of competition. The decline in sales was felt even in the electric shift market where, by the latter date cables were tied to electric shift engines. (DX 82, p. II). In March 1963, after a price analysis had been made, it was learned that O.M.C. was losing money on its cables on a full cost recovery bsais.[27] (PDX 70, 71; Tr. 1412–15, 1251.) This disclosure, of course, forced O.M.C. to change its pricing policy if it were to stay in the cable business. (PDX 70, 71; Tr. 1251, 1412–1415.) The higher list price-greater discount policy was one Teleflex had originally adopted for its own use. (Tr. 1433; Shontz Dep. 418—Docket Item 156.) N.W. also gave greater discounts in 1962 and 1963. (Tr. 517–518.) O.M.C.'s 1963 pricing decision was made on the basis that even if volume of cable sales dropped, O.M.C. would be netting at least a 50 cent profit on the cables that it would sell. (PDX 70, 71; Tr. 1412–1415.) In short, O.M.C. did not believe that it would or could retain the market with its price rise; however, that was the only policy open to it to stem the loss of money and still remain in the cable business. (Tr. 1251.)

Unit sales of O.M.C. mechanical shift engines of 18 h. p. and over have remained relatively constant from 1963 until this suit was brought (DX 82, p. I, col. A), but during that same period O.M.C. cable shipments (other than certificated cable tie-ins to the sale of electric shift engines), continued to decline. (DX 82, p. II, col. L.) O.M.C.'s percentage of the O-style cable market declined from approximately 51 per cent in 1963 to 32 per cent in 1969. (DX 82, p. II, col. M.)

Contrary to N.W.'s contentions, the record does not support the conclusion that O.M.C.'s price and discount changes in 1961 and 1963 reflect either monopoly power, or acts taken to retain a monopoly, or acts taken with the specific intent to create a monopoly. Rather, the evidence shows that the pricing steps undertaken at the time were good-faith business efforts to meet competitive situations and were accomplished without any underlying motive to drive N.W. or other competitors from the cable market.

## VI. SETTING UP A SUPPLIER.

During the course of the trial, N.W. asserted a new claim under Section 2 of the Sherman Act. The new claim was based on the following chain of reasoning: O.M.C. in 1970, long after the suit was filed, began to buy some of its remote cables from Morse Instrument Division of North American Rockwell Corporation ("Morse"); theretofore Morse had been only an insignificant competitor in the cable market (Tr. 584), though large in other marine products; since Morse was thus assisted in the cable business by a profitable order from O.M.C., it was able to manufacture cables less expensively than it otherwise could have, and as a result of the new strength, Morse underpriced N.W. and took away Canadian Tire Corporation, a customer that had dealt with N.W. for ten or twelve years previously (Tr. 2292) and presumably would have remained N.W.'s customer indefinitely. (Tr. 584–589.)

The record does indicate that Morse became one of O.M.C.'s cable suppliers in 1970. (Stip. Fact 12; Tr. 1437–1438.) It also appears that in 1970 N.W. lost its account which Canadian Tire Company, a Canadian outlet for control boxes and cables, to Morse. (Tr. 584–589, 2292.) The record also reflects that, while Morse had been in the cable business for years, it only recently began to manufacture its own cables. This occurred only after it was taken over by North American Rockwell (Tr. 586), a much larger company. Historically, O.M.C. has had at least two cable suppliers (Tr. 1854), but in 1970 Condex

---

27. The loss per cable was approximately 48¢. (PDX 70, p. 4.)

Corporation—one of its two along with American Chain—during the choice selling season was unable to supply its quantity. (Tr. 1854.) Morse was willing to sell O.M.C. its cables for a lower price than O.M.C. was paying American Chain and Condex.[28] (Tr. 2099–2100.) Morse was provisionally approved as a supplier, subject to testing at O.M.C.'s Florida test station, because its cables appeared to have met O.M.C.'s specifications and were competitively priced. (Tr. 1854–1855, 2099–2100; DX 96.)

The record fails to bear out N.W.'s theory. N.W. has not sustained its burden of proof of the causal connection between its loss of the Canadian Tire account and Morse becoming a supplier of O.M.C. The evidence adduced fails to prove that O.M.C. selected Morse as a supplier for the purpose and intent of injuring N.W.

## VII. RELIEF.

### A. Injunction.

■ The Court has heretofore found that O.M.C.'s practice of tying the sales of its remote control throttle cables with its electric shift outboard and stern drive engines under its cable certificate and bundling programs violates Section 3 of the Clayton Act. The Court also concludes that without enjoining such practices in the future the contemporary violations of Section 3 are likely to continue. Consequently, as a reasonable method of enforcing the antitrust laws, an injunction will be granted restraining O.M.C.'s practice of tying the sales of remote control cables to the sales of its electric shift outboard and stern drive engines. Zenith Radio Corp. v. Hazeltine, supra, 395 U.S. at 129–133, 89 S.Ct. 1562, 23 L.Ed.2d 129.

### B. Damages Arising From O.M.C.'s Outboard Engine Control Cable Certificate Program.

The parties have stipulated the appropriate method for computing N.W.'s damages resulting from O.M.C.'s practice of tying its O-style remote control cables to its electric shift outboard engines. Since O.M.C. did not tie remote control cable sales to its mechanical shift engines, N.W. was able to sell a substantial quantity of O-style cables in the outboard dealer segment of the market. The stipulated method for calculating N.W.'s damages from the foreclosure effect of the certificate program is to use N.W.'s actual penetration into the unforeclosed portion of the O-style cable market as a bench mark for determining the percentage of the foreclosed certificated O-style market which N.W. would have gotten had it not been barred by O.M.C.'s practices. This percentage is to be applied to the actual number of electric shift outboard engines sold by O.M.C. during the damage period to determine N.W.'s lost cable sales.[29] The lost cable sales are then to be multiplied by N.W.'s profit per cable in order to obtain N.W.'s single damages, which, in turn, are to be trebled in accordance with 15 U.S.C. § 15. (Pretrial Order, Tab 15–Docket Item 111.)

In order to compute the damages to the date of judgment according to the stipulated formula, the Court is required to make two factual determinations which are in dispute—(1) the number of O-style cables that were sold by N.W. in the replacement market and were not sold for use on new O.M.C. mechanical shift engines, and (2) N.W.'s per unit O-style cable profit.

---

28. The average price for cable paid to Morse was $2.69 and to the other two suppliers was $2.87. (Tr. 2100.)

29. By stipulation, N.W.'s damages arising from the cable certificate program are to be computed for the period from June 16, 1965 (four years prior to filing the complaint) to the date judgment is entered. (Pretrial Order, Tab 15—Docket Item 111.)

1. *Alleged Replacement Cable Market For Controls Sold For Mechanical Shift Outboard Engines.*

With respect to the first question as to the number of O-style cables N.W. sold in the replacement market, O.M.C. contends that approximately 40 per cent of the control cables sold by N.W. were sold as replacement for engines in use or sold as part of second-hand engine sales.[30] Therefore, O.M.C. argues that, in order to compute N.W.'s percentage share of the unforeclosed cable market for mechanical shift engines, the appropriate figure for the formula must be reduced to 60 per cent of N.W.'s total sales of such cables in any given year because 40 per cent of the total yearly sales constituted sales in the replacement market. On the other hand, N.W. contends that its sales of cables in the replacement market were negligible, and in any event, no competent evidence exists in the record for making even an educated guess.

█ The Court agrees that the record is barren of sufficient evidence to demonstrate that a substantial replacement market for cables existed. O.M.C.'s estimate of N.W.'s cable sales made in the replacement market was based on industry wide sales figures of all types and brands of outboard engines and on the testimony of Mr. Shontz, N.W.'s President, that N.W.'s cable life for warranty purposes was five years. (Tr. 2060–2064; DX 79, p. 5, DX 82, III.) In the absence of any accurate evidence of the sales of N.W.'s cable sold in the replacement market, the most reasonable method of computing N.W.'s damages from the foreclosure effect of the cable certificate program is to regard the replacement market, into which any of N.W.'s cables may have flowed, as "de minimis." O.M.C.'s estimate of the replacement market, based on its artificial assumptions, is too speculative and uncertain to be considered in computing N.W.'s share of the foreclosed cable market resulting from O.M.C.'s certificate program.

2. *N.W.'s Profit Per Cable For Outboard Engines.*

█ It is settled law that, while the fact of damage arising from a civil antitrust violation must be definitely attributable to the wrong alleged without any element of uncertainty, a dollar value may be assigned to such an injury even if some uncertainty exists as to the amount. Thus, a fact-finder may make a just and reasonable estimate of damages based on relevant data because the fact-finder is allowed to act upon probable and inferential as well as direct and positive proof. Damages in such cases are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient if a reasonable basis is afforded although the result may be only approximate. Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264–265, 66 S.Ct. 574, 90 L.Ed. 652 (1946); Story Parchment Co. v. Paterson Parchment Co., 282 U.S. 555, 560–564, 51 S.Ct. 248, 75 L.Ed. 544 (1931); Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 379, 47 S.Ct. 400, 71 L.Ed. 684 (1927).

There is no question, as the Court has already determined, that O.M.C.'s practice of tying the sales of remote control cables with the sales of its electric shift outboard and stern drive engines in violation of Section 3 of the Clayton Act directly injured N.W. The problem arises in determining the most reasonable method for computing N.W.'s percentage of profit per cable, which factor is basic to applying the stipulated damage formula. Needless to say, the parties are in sharp dispute as to the most reasonable and just method for making this determination.

█ O.M.C. contends that the best available data for making this determination is derived from N.W.'s financial re-

---

30. The stipulated formula is dependent on determining the number of cables that N.W. actually sold for use on *new* O.M.C. mechanical shift engines. Thus any cables sold as replacements on old engines should be deducted from the total number of O-style cables sold by N.W.

ports for the years 1965–1970. Mr. Richardson, O.M.C.'s witness, concluded from these reports that N.W.'s actual profit per cable before taxes was approximately 11.37 per cent of its selling price. (DX 82, IV; Tr. 2065–2070.) The Court is satisfied, however, that O.M.C.'s method of ascertaining N.W.'s per unit cable profit should not be used in this case because N.W.'s gross profit figures reflect fixed costs which N.W. incurred regardless of whether it had manufactured and sold the additional cables for which it claims damages. Inclusion of these fixed costs precludes a proper damage calculation.

The theory of damage determination appropriate to this litigation is to place N.W. in the same position it would have been had it gained the additional portion of the cable market from which it was foreclosed by O.M.C.'s illegal tie-in. Thus, N.W. is entitled to the selling price of its cables less the cost of producing the same. The appropriate cost figure embodies the variable expenditures which N.W. would have had to incur in order to manufacture and distribute the additional cables, i. e., the cost of parts, additional labor for assembly, additional distribution expenses, etc. It does not, however, include fixed costs, i. e., amortization, salary expenses for personnel not involved in the production and sale of additional cables, insurance, etc., since these general overhead costs were already absorbed by N.W. each year despite O.M.C.'s illegal tying practices. Since it is apparent that these overhead costs would not have materially increased [31] had N.W. been able to produce and sell the additional cables, such costs, in fact, bore no relation to what N.W.'s per cable profit would have been for the additional cables but for O.M.C.'s wrongful conduct. F. A. Bartlett Tree Expert Co. v. Hartney, 308 Mass. 407, 32 N.E.2d 237, 240 (1941); Jessup & Moore Paper Co. v. Bryant Paper Co., 297 Pa. 483, 147 A. 519, 524 (1929); 5 Corbin on Contracts § 1038 (1964). Consequently, the Court rejects O.M.C.'s theory for computing N.W.'s percentage of cable costs.

On the other hand, N.W. has presented evidence to estimate what its actual profit per cable would have been had it been able to produce and distribute additional cables in the foreclosed market but for O.M.C.'s wrong. First, for the purpose of estimating its profit per cable, N.W. has used the cost figures and the selling price of a twelve foot cable as an average length. This appears reasonable because the record shows that both O.M.C. and N.W. sold more twelve foot remote control cables for use with outboard engines than any other cable length. (Stip. Fact 33; O.M.C.'s Ans. to Int. 110 – Docket Item 98.)

In order to determine the cost of its cables, N.W. used a job-shop accounting method pursuant to which the cost of each component of the cable was determined by computing the cost of the material in that component and by adding in the applicable machine hourly rate for that component to determine the cost for each of these parts; to the cost of the material and parts was added the costs of assembling each of these components together to fabricate a completed cable and then to add the costs of packaging and shipping the cable. N.W. then deducts the total of these costs items from its selling price to distributors in order to arrive at its per unit cable profit. The Court finds that this is a reasonable and appropriate method for determining N.W.'s profit per cable.

Mr. Shontz, President of N.W., testified that each year he computed the actual cost of a cable as outlined above and then attempted to set a selling price at a figure of 100 to 125 per cent above costs. (Tr. 798.) Mr. Shontz also wrote in his general notes regarding N.W.'s estimated profit per cable for all style marine cables that: "If at all possible, we try

---

31. For example, N.W.'s front office personnel responsible for marine sales and administration increased only from two people to 2.5 over a ten year period. (Tr. 886–891.)

to maintain a 100 to 125% mark up over costs on cables. Sometimes we can; sometime we can't." (PX 247.) From the cost and pricing figures prepared each year by Mr. Shontz for O-style cables, Mr. Shontz has retained only two sets of figures—one relating to the 1961–1962 season (DX 69), and the other to the 1968–1969 season. (DX 71.) The 1961–1962 figures showed cable cost of $1.53, a sale price of $2.70, and a profit of $1.17. (DX 69.) This amounted to an 88 per cent mark up over costs or a profit of 44 per cent of the actual selling price. The 1968–1969 figures showed a cable cost of $1.395, a sale price of $3.15 and a profit of $1.755. (DX 71.) [32] This amounted to about a 125 per cent mark up over cost or a profit of approximately 55 per cent of selling price. As to the profit figures proposed by N.W. for the period 1965 to 1968 and 1970, Shontz, not having retained his cost and pricing figures for those years, averaged the cost for each year between the figures shown for the 1961–1962 season with those of the 1968–1969 season. (Tr. 806–808.)

Since there is no clear evidence that N.W.'s costs were reduced from the actual figures determined for 1961–1962, the Court concludes that it is just and reasonable for all years from 1965 to date, with the exception of the 1968–1969 season, to estimate N.W.'s profit per cable as 45 per cent of the selling price, or otherwise stated, as a 90 per cent mark up over cost. For the 1968–1969 season, the Court accepts the actual computed figures to substantiate a per cable profit of approximately 55 per cent of selling price, or approximately 125 per

cent mark up over cost. (PX 304, PX 247, DX 71.)

N.W.'s sale price to distributors for such cables from October 1964 to October 1966 was $3.00 per cable and from October 1966 to date $3.15. (DX 41, 42, 43, 44 & 36.) On the basis of the 45 per cent profit of selling price, the Court finds that N.W.'s profit per cable was:

| October 1964–1965 | – | $1.35 |
|---|---|---|
| October 1965–1966 | – | 1.35 |
| October 1966–1967 | – | 1.4175 |
| October 1967–1968 | – | 1.4175 |
| October 1968–1969 | – | 1.755 [33] |
| October 1969–1970 | – | 1.4175 |

The Court finds support in the above estimates of per cable profit for O-style cables by reference to existing records of the profit per M-style cable. Those records indicate that for the years 1963, 1969 and 1970, N.W.'s per cable profit for M-style cables [34] also amounted to 45 per cent of the selling price. (PX 247.)

C. Damages Arising From O.M.C.'s Sale of Cables Bundled With Stern Drive Engines.

There is only one major issue in dispute between the parties as to how N.W.'s damages should be computed resulting from O.M.C.'s bundling of cables with its stern drive engines. [35] The issue concerns the proper bench mark which should be used to determine the penetration that N.W. would have made in the stern drive cable market had it not been foreclosed by the tie.

N.W. contends that its experience in selling O-style cables to distributors and dealers for use with mechanical shift

32. N.W.'s cost figures were .04 cents too high and were accordingly adjusted. (PX 304.)

33. As indicated above, N.W. has retained actual cost and pricing figures to substantiate the per cable profit for the 1968–1969 season. (PX 304, DX 71, PX 247.)

34. M-style cables are comparable to O-style cables but have end fittings for use with Mercury rather than O.M.C. engines. The calculated profit for M-style cable for 1968

shows a 48 per cent profit on selling price. (PX 247.)

35. The parties have agreed (1) on the number of O.M.C. stern drive engines which have been sold during the recoverable damage period (Stip. Fact 92), and (2) that N. W.'s profit per cable for cables sold with stern drive engines is identical to its profit per cable for cables sold to dealers in the outboard segment of the market. (P.B. p. 157—Docket Item 158; D.B. p. 180—Docket Item 162.)

outboard engines is the better indicator of its ability to penetrate the stern drive cable market. O.M.C. contends, on the other hand, that the better indicator of N.W.'s ability to penetrate this market should be based on N.W.'s actual experience in selling M-style cables to boat builders for use with stern drive engines.

Having considered all the factors involved, the Court is convinced that the better indicator of N.W.'s probable success of selling O-style cables for use with O.M.C. stern drives would be very close to N.W.'s actual experience in selling M-style cables to boat builders for use with Mercury stern drive engines. This is so because the O-style and M-style cables are alike except for their end fittings. Boat builders often install both O.M.C. and Mercury stern drives in the same type of boats. (Tr. 626–628.) The selling efforts for both the O-style and M-style cable to boat builders would be the same. The selling effort and means of distributing O-style cables for use with outboard engines are substantially different. Indeed, N.W.'s President testified that his success in selling M-style cable to boat builders was the basis for his belief that N.W. could also sell O-style cables to them. (Tr. 295.)

Despite N.W.'s arguments to the contrary, the Court finds that N.W.'s actual share of the M-style cables market with boat builders should be used in estimating N.W.'s share of the O-style cable market.[36]

The foregoing shall constitute the findings of fact and conclusions of law as required by Rule 52(a), F.R.Civ.P.

For the reasons stated, N.W. is entitled to judgment granting injunctive relief and damages to be computed as herein stated. A prompt hearing will be sched-uled on N.W.'s application for an allowance of reasonable attorneys' fee under 15 U.S.C. § 15.

Submit judgment.

---

36. N. W. indicated its share of the market based on N. W.'s sale of M-style cables was 20 per cent for 1965 and 1966, 20.5 per cent for 1967, 22 per cent for 1968, 21 per cent for 1969 and 20 per cent for 1970. (Tr. 2081–2082; Stip. Fact 92; Ex. 3-C of O. M. C.'s Ans. to 3d Set of Interrogatories—Docket Item 98.)